1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   Post Montgomery Center
3  One Montgomery Street, Suite 1800
   San Francisco, CA  94104
4  Telephone:  415/288-4545
   415/288-4534 (fax)
5  shawnw@rgrdlaw.com
            – and –
6  RANDALL J. BARON (150796)
   TRAVIS E. DOWNS III (148274)
7  BENNY C. GOODMAN III (211302)
   ERIK W. LUEDEKE (249211)
8  655 West Broadway, Suite 1900
   San Diego, CA  92101
9  Telephone:  619/231-1058
   619/231-7423 (fax)
10 randyb@rgrdlaw.com
   travisd@rgrdlaw.com
11 bennyg@rgrdlaw.com
   eluedeke@rgrdlaw.com
12
   Attorneys for Plaintiffs
13
                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA
14

| | |
|---|---|
| THOMAS E. MARTIN, JOHN E. SICKLE, JR., JOHN R. SINDYLA, TIMOTHY L. MILLER, TODD ALISHUSKY, and DAN FINDLEY, in Their Capacities as Trustees of SHEET METAL WORKERS LOCAL NO. 33 (CLEVELAND DISTRICT) PENSION FUND, Derivatively on Behalf of WELLS FARGO & COMPANY,<br><br>                          Plaintiffs,<br><br>          vs.<br><br>STEVEN D. BLACK, MARK A. CHANCY, CELESTE A. CLARK, THEODORE F. CRAVER, JR., RICHARD K. DAVIS, WAYNE M. HEWETT, CECELIA G. MORKEN, MARIA R. MORRIS, FELICIA F. NORWOOD, RICHARD B. PAYNE, JR., RONALD L. SARGENT, SUZANNE M. VAUTRINOT, CHARLES W. SCHARF, MICHAEL P. SANTOMASSIMO, SCOTT E. POWELL, DEREK A. FLOWERS, MUNEERA S. CARR, | Case No.  3:23-cv-03564<br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, CORPORATE WASTE, AND UNJUST ENRICHMENT |

[Caption continued on following page.]

1

ELIZABETH A. DUKE, JUAN A. PUJADAS,
2   CHARLES H. NOSKI, DONALD M. JAMES,
TIMOTHY J. SLOAN, JOHN R.
3   SHREWSBERRY, and C. ALLEN PARKER,

4            Defendants,

5        – and –

6   WELLS FARGO & COMPANY, a Delaware
corporation,
7
            Nominal Party.
8

DEMAND FOR JURY TRIAL

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

"*[I]t is clear to this committee that the bank you inherited is essentially a lawless organization that has caused widespread harm to millions of consumers throughout the nation.*"

U.S. Congresswoman Maxine Waters, Chair of the House Committee on Financial Services, March 10, 2020.

"*Wells Fargo has a well known record of mismanagement and corruption: the bank created millions of fake bank and credit card accounts, falsified signatures, illegally transferred customers' funds, and charged hundreds of thousands of customers fraudulent fees.   Additionally, it was implicated in ripping off hundreds of thousands of customers who took out car loans from the bank, and for years the bank charged monthly fees to customers for dozens of products they didn't understand or know how to use.*"

U.S. Senator Elizabeth Warren, Chair of the Senate Banking, Housing, And Urban Affairs Subcommittee On Economic Policy, September 14, 2021.

## INTRODUCTION

1.     This is a shareholder derivative action.  Plaintiffs, as Trustees of the Sheet Metal Workers Local No. 33 (Cleveland District) Pension Fund, are shareholders of nominal party Wells Fargo & Company, a Delaware corporation, since May 2017.  Wells Fargo & Company operates through its principal banking subsidiary, Wells Fargo Bank, N.A. (together, "Wells Fargo" or the "Company").  Defendants are current or former directors and/or officers of Wells Fargo.  Recently Wells Fargo paid $4.7 billion to resolve claims brought by federal regulators and shareholders around the Company's lack of risk compliance programs and infrastructure, and the rate at which defendants claimed Well Fargo was supposedly fixing myriad deficiencies and gaps in its risk infrastructure.  Despite nearly $5 billion in fines, penalties, and settlement payments, Wells Fargo's lawless ways continue, including renewal of alleged discriminatory home loan lending practices.  By this action, plaintiffs seek redress against defendants for Wells Fargo's lawlessness under their stewardship.

## OVERVIEW OF THE ACTION

2.     Wells Fargo is an unwieldy conglomeration of randomly acquired banking companies merged over the past decades.  The result is a behemoth, mega-bank prone to corporate scandal and general lawlessness.

3.     For years, Wells Fargo took advantage of customers on their auto loans, home mortgages, and bank accounts.  Without legal right, Wells Fargo repossessed peoples' cars and

1  took actions that resulted in borrowers wrongfully losing their homes.  Wells Fargo also charged

2  improper overdraft fees on checking accounts, further harming its customers.  Wells Fargo's

3  "rinse-and-repeat cycle of violating the law," as Consumer Financial Protection Bureau ("CFPB")

4  Director Rohit Chopra recently said, "has harmed millions of American families."

5         4.      Despite knowing of ongoing and serious violations of laws, rules, and regulations

6  across significant parts of Wells Fargo's business, defendants took no steps to remedy such

7  lawlessness.   Instead, at times, they embraced the abuse and corruption of Wells Fargo's

8  customers' accounts to extract excess profits and, in turn, line their own pockets with generous but

9  unearned, at least not lawfully earned, incentive compensation and directors' fees.  At the same

10  time, Wells Fargo's leaders repeatedly assured the public that Wells Fargo was fixing its broken

11  culture.  They also publicly represented that Wells Fargo was moving with alacrity to remedy its

12  broken risk-management systems, which, among other things, allowed Wells Fargo's sales staff to

13  open 3.5 million fake customer accounts and engage in myriad other wrongdoing.   These

14  statements concealed the dismal status of Wells Fargo's regulatory compliance infrastructure and

15  that defendants were not timely fixing Wells Fargo's broken culture and risk-management systems.

16         5.      In early 2020, Congress launched an investigation into Wells Fargo's abuse of its

17  consumer and non-compliance with Consent Orders.  The Congressional report uncovered the fact

18  Wells Fargo's leadership was continuing to pay lip service to Wells Fargo's duty to comply with

19  the law.  *The Real Wells Fargo:  Board & Management Failures, Consumer Abuses, And*

20  *Ineffective Regulatory Oversight*, Report Prepared by the Majority Staff of the Committee on

21  Financial Services, U.S. House of Representatives (Mar. 20, 2020) ("Majority Report"),

22  https://www.congress.gov/116/meeting/house/110719/documents/HHRG-116-BA00-20200311-

23  SD003.pdf.   After investigation, the Majority staff of the U.S. House Financial Services

24  Committee published a scathing report on Wells Fargo.  Key findings include that: (i) "Wells

25  Fargo's board of directors failed to ensure management could competently address the Company's

26  risk management deficiencies"; (ii) "Wells Fargo's board of directors allowed management to

27  repeatedly submit materially deficient plans to regulators in response to the consent orders"; (iii)

28  "both Wells Fargo's board and management prioritized financial and other considerations above

fixing the issues identified by regulators"; (iv) Wells Fargo's board did not hold senior management accountable for repeatedly failing to meet regulators' expectations"; (v) "former Wells Fargo CEO Timothy J. Sloan gave inaccurate and misleading testimony to Congress during a March 2019 Committee hearing"; and (vi) "the potential for widespread consumer abuse still remains at Wells Fargo."  Majority Report at 4-5.

6.      Elaborating, the Majority Report found a "prolonged failure of Wells Fargo's board and management to satisfy the terms of the consent orders and establish the safeguards necessary to protect consumers from harm," and that "Wells Fargo's board failed to hold senior management accountable for the Bank's lack of progress under the consent orders, despite the performance concerns raised by regulators and certain board members."  Majority Report at 8-9.  Additionally, the Majority Report found that Wells Fargo "focused on profits and exiting the regulators' consent orders rather than on fixing the Bank's long-standing compliance management weaknesses."  *Id.* at 74.  "Rather than developing adequate plans in response to the 2018 Federal Reserve Consent Order, Wells Fargo's board and senior management concentrated their efforts on lifting the asset cap," the Majority Report said.  *Id.*

7.      Additionally, the Majority Report found that the Wells Fargo Board of Directors (the "Board") failed to fix Wells Fargo's legal compliance deficiencies, by making harmed customers whole and ensuring that Wells Fargo had in place risk-management and remediation programs commensurate with its complexity, risk, and size.  Majority Report at 74.  The Wells Fargo Board also "resisted the regulators' admonishment to hold executives accountable for the Bank's poor performance in terms of resolving outstanding regulatory issues," according to the House investigators.  *Id.*

8.      Based on these and other damning findings, the Majority Report concluded that Wells Fargo "continues to struggle to implement effective risk management and remediation programs when compliance breakdowns occur, that Wells Fargo's board and management repeatedly have failed to demonstrate that the Bank can establish a compliance management infrastructure capable of preventing consumer abuses, and that Wells Fargo's leadership has been unable to change the Bank's culture."  Majority Report at 73-74.

9.     Once the truth emerged, Wells Fargo was forced to pay a huge price.  In December 2022, Wells Fargo paid a record $3.7 billion to resolve legal liability arising from its abuse of auto and home mortgage loan customers and depositors.  *CFPB Orders Wells Fargo to Pay $3.7 Billion for Widespread Mismanagement of Auto Loans, Mortgages, and Deposit Accounts*, Consumer Financial Protection Bureau (Dec. 20, 2022), https://www.consumerfinance.gov/about-us/newsroom/cfpb-orders-wells-fargo-to-pay-37-billion-for-widespread-mismanagement-of-auto-loans-mortgages-and-deposit-accounts/.  Then, in May 2023, Wells Fargo agreed to pay an additional $1 billion for resolve securities fraud claims arising from false statements about the pace of Wells Fargo's remediation efforts.  *In re Wells Fargo & Company Sec. Litig.*, No. 1:20-cv-04494-GHW-SN (S.D.N.Y.) ("Securities Action"), *see also* Kevin LaCroix, *Wells Fargo Settles Securities Suit for $1 Billion*, The D&O Diary.com (May 16, 2023), https://www.dandodiary.com/2023/05/articles/securities-litigation/wells-fargo-settles-securities-suit-for-1-billion/.

10.     Still today doubt remains whether Wells Fargo is operating lawfully.  A *Bloomberg* report in March 2022 found that Wells Fargo was the only major U.S. lender to reject more African American mortgage refinancing applications than it approved in the 2020 mortgage refinancing boom.  Wells Fargo approved 72% of white mortgage applicants in the same period, *Bloomberg* found.  For historical context, in 2012, Wells Fargo promised not to discriminate against qualified African American mortgage borrowers in a $234.3 million settlement with the U.S. Department of Justice ("DOJ") – a promise that Wells Fargo has not kept.  As a result, Wells Fargo is presently the subject of multiple discriminatory lending lawsuits, brought by individuals and municipalities alleging that Wells Fargo violated the law by unlawfully discriminating against qualified minority borrowers in its mortgage lending.  Wells Fargo is also under criminal investigation for engaging in "fake diversity interviews" in which Wells Fargo interviewed diverse candidates for positions already filled by someone else.

11.     Delaware law does not tolerate law-breakers.  Every corporation incorporated under the laws of Delaware shall conduct its affairs, business, and operations in accordance with the federal, state, and local laws, rules, and regulations that govern the corporation.  Plainly, Wells

1  Fargo has not.  Wells Fargo is a law-breaker and so too are defendants for not stopping Wells

2  Fargo's serial violations of law.  Accordingly, plaintiffs bring this action to hold defendants

3  accountable for breaching their fiduciary duties.

4         12.  A pre-suit demand on Wells Fargo's Board is unnecessary because making such a

5  demand is a useless and futile action.  Despite known legal duties to act, some embodied in Consent

6  Orders entered by the Board, defendants did not stop Wells Fargo's serial violations of law.

7  Neither Wells Fargo nor its Board adopted internal controls and risk infrastructure commensurate

8  with Wells Fargo's structure, risk profile, complexity, activities, and size – even despite

9  agreements made in Consent Orders with regulators to do so.  In the face of red flags, defendants

10  also did not stop Wells Fargo's violations of law across large and varied parts of its business.

11  Moreover, a sister court, in *Himstreet v. Scharf*, No. CGC-22-599223 (Cal. Super. Ct., San

12  Francisco Cnty. Oct. 5, 2022), recently determined that a pre-suit demand is futile as to a majority

13  of the members of Wells Fargo's Board.  That judicial finding should be binding here as well.

14                      **JURISDICTION AND VENUE**

15         13.  This Court has jurisdiction under 28 U.S.C. §1332(a)(2).  This is because plaintiffs

16  and defendants are citizens of different states.  Plaintiffs and nominal party Wells Fargo are citizens

17  of different states as well.  The amount in controversy exceeds $75,000, exclusive of interest and

18  costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United

19  States that it would not otherwise have.

20         14.  The Court has supplemental jurisdiction over the state law claims asserted herein

21  under 28 U.S.C. §1367(a).

22         15.  This Court has jurisdiction over each defendant because each defendant is an

23  individual with sufficient minimum contacts with this District to make the exercise of jurisdiction

24  by this Court permissible under traditional notions of fair play and substantial justice.  This Court

25  has jurisdiction over nominal party Wells Fargo because it is a corporation that conducts business

26  in and maintains operations within this District and, therefore, the exercise of jurisdiction by this

27  Court is permissible under traditional notions of fair play and substantial justice.

28

16.     Venue is proper under 28 U.S.C. §1391(a) because Wells Fargo maintains offices within this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## INTRA-DISTRICT ASSIGNMENT

17.     A substantial portion of the acts and transactions giving rise to the violations of law alleged herein occurred in the City and County of San Francisco, and as such, this action may be properly assigned to the San Francisco division of this Court.

## THE PARTIES

**Plaintiffs**

18.     Plaintiffs Thomas E. Martin, John E. Sickle, Jr., John R. Sindyla, Timothy L. Miller, Todd Alishusky, and Dan Findley are the Trustees of Sheet Metal Workers Local No. 33 (Cleveland District) Pension Fund and each of them pursues this action in that capacity.  Each of the Trustees is a citizen of the State of Ohio.

**Nominal Party**

19.     Nominal party Wells Fargo, a Delaware corporation, is a global financial services company with its principal executive offices located at 420 Montgomery Street, San Francisco, California 94104.

20.     Wells Fargo provides a diversified set of banking, investment, and mortgage products and services, as well as consumer and commercial finance, through banking locations and offices, the internet (www.wellsfargo.com), and other distribution channels.

21.     As of December 2022, Wells Fargo had approximately 238,000 employees, with approximately 81% in the United States.  Across its enterprise, Wells Fargo claims to "set common expectations for everyone at the Company."  These expectations "apply to everyone at Wells Fargo, at every level, and in every role": "Embrace candor.  Do what's right.  Be great at execution. Learn and grow.  Champion diversity and inclusion.  Build high-performing teams (for managers)."  2022 Annual Report on U.S. Securities and Exchange Commission ("SEC") Form 10-K at 1.

1    22.    Wells Fargo is a citizen of California and Delaware.

2  **Directors**

3    23.    Defendant Steven D. Black ("Black") has been a director of Wells Fargo since April

4  2020.  Black also has served on the Finance and Human Resources Committees of Wells Fargo's

5  Board.   In 2022, Black received director's fees consisting of cash and stock awards worth

6  $599,769.  On information and belief, Black is a citizen of Connecticut.

7    24.    Defendant Mark A. Chancy ("Chancy") has been a director of Wells Fargo and a

8  director of Wells Fargo Bank, N.A. since August 2020.  Chancy also has served on the Audit and

9  Finance Committees of Wells Fargo's Board.  In 2022, Chancy received director's fees consisting

10  of cash and stock awards worth $372,311.   On information and belief, Chancy is a citizen of

11  Georgia.

12    25.    Defendant Celeste A. Clark ("Clark") has been a director of Wells Fargo since

13  January 2018.   Clark also has served on the Corporate Responsibility and Governance &

14  Nominating Committees of Wells Fargo's Board.   In 2022, Clark received director's fees

15  consisting of cash and stock awards worth $370,769.  On information and belief, Clark is a citizen

16  of Florida.  Clark owns a house in Longwood, Florida and it is listed on property records as owner

17  occupied.  Property records indicate the last sale of the property occurred in August 2013.  In 2011,

18  Clark retired as a Senior Vice President of Kellogg Company in Battle Creek, Michigan.  Clark

19  last voted in November 2022 and used the Longwood, Florida address.  She last voted in Michigan

20  in November 2012, after first registering to vote in Michigan in 1979.   Clark also used the

21  Longwood, Florida address for a driver's license issued in Florida in April 2023.  Clark's previous

22  driver's license issued in February 2015 was also issued in Florida using the Longwood, Florida

23  address.  Additionally, political contribution records show an October 2022 contribution by Clark

24  to a Wells Fargo Political Action Committee ("PAC") using the Longwood, Florida address.

25  Florida DMV records indicate Clark registered a vehicle in Florida using the Longwood, Florida

26  address within the past few years.   Although Clark owns real estate located in Battle Creek,

27  Michigan, the address is the same address used by Abraham Clark Consulting LLC, a health

28  regulatory policy consulting firm formed by Clark.  Property records show the address for the

1   owner of the Battle Creek, Michigan property is the same as Clark's address in Longwood, Florida.

2   On information and belief, the Battle Creek, Michigan property does not appear to be a primary

3   residence.

4          26.     Defendant Theodore F. Craver, Jr. ("Craver") has been a director of Wells Fargo

5   and a director of Wells Fargo Bank, N.A. since January 2018.  Craver also has served on the Audit,

6   Finance, and Governance & Nominating Committees of Wells Fargo's Board.  In 2022, Craver

7   received director's fees consisting of cash and stock awards worth $411,269.  On information and

8   belief, Craver is a citizen of California.

9          27.     Defendant Richard K. Davis ("Davis") has been a director of Wells Fargo and a

10   director of Wells Fargo Bank, N.A. since April 2022.  Davis also has served on the Risk Committee

11   of Wells Fargo's Board.  In 2022, Davis received director's fees consisting of cash and stock

12   awards worth $313,866.  On information and belief, Davis is a citizen of Arizona.

13          28.     Defendant Wayne M. Hewett ("Hewett") has been a director of Wells Fargo since

14   2019.  Hewett also has served on the Corporate Responsibility, Governance & Nominating, Human

15   Resources, and Risk Committees of Wells Fargo's Board.  In 2022, Hewitt received director's fees

16   consisting of cash and stock awards worth $380,769.  On information and belief, Hewett is a citizen

17   of Connecticut or Florida, although likely the latter.  Hewett has a Florida driver's license issued

18   in early June 2015 that will expire in fall 2023.  He used an address in West Palm Beach, Florida

19   for the driver's license, where, according to property records, he maintained a residence between

20   April 2015 and August 2015.  Hewett currently owns a residence in a waterfront enclave located

21   Fort Lauderdale, Florida purchased December 2019.  From August 2021 to February 2022, he

22   served as a director of the condominium association for the Fort Lauderdale property.  Hewett also

23   owns a single-family home located in Ridgefeld, Connecticut purchased in 2003.  In 2022, Hewett

24   made political contributions to PACs using the Ridgefeld, Connecticut and Fort Lauderdale,

25   Florida addresses.  Hewett's Linkedin.com pages introduces him as a "Board Director and CEO"

26   in Fort Lauderdale, Florida, United States."  Hewett last voted in November 2022 and used the

27   Fort Lauderdale, Florida address.  He voted in November 2020 and used the Fort Lauderdale,

28

1  Florida address as well.  Before that, in 2015, Hewett voted and used the West Palm Beach, Florida

2  address.

3        29.    Defendant CeCelia G. Morken ("Morken") has been a director of Wells Fargo since

4  April 2022.  Morken also has served on the Audit and Corporate Responsibility Committees of

5  Wells Fargo's Board.  In 2022, Morken received director's fees consisting of cash and stock

6  awards worth $308,075.  On information and belief, Morken is a citizen of Texas.

7        30.    Defendant Maria R. Morris ("Morris") has been a director of Wells Fargo and a

8  director of Wells Fargo Bank, N.A. since January 2018.  Morris also has served on the Human

9  Resources and Risk Committees of Wells Fargo's Board.  In 2022, Morris received director's fees

10  consisting of cash and stock awards worth $425,019.  On information and belief, Morris is a citizen

11  of New Jersey.

12        31.    Defendant Felicia F. Norwood ("Norwood") has been a director of Wells Fargo

13  since April 2022.  Norwood also has served on the Risk Committee of Wells Fargo's Board.  In

14  2022, Norwood received director's fees consisting of cash and stock awards worth $308,075.  On

15  information and belief, Norwood is a citizen of Indiana.

16        32.    Defendant Richard B. Payne, Jr. ("Payne") has been a director of Wells Fargo and

17  a director of Wells Fargo Bank, N.A. since October 2019.  Payne also has served on the Risk

18  Committee, as well as the Credit Subcommittee, of Wells Fargo's Board.  In 2022, Payne received

19  director's fees consisting of cash and stock awards worth $367,269.  On information and belief,

20  Payne is a citizen of North Carolina.

21        33.    Defendant Ronald L. Sargent ("Sargent") has been a director of Wells Fargo since

22  February 2017.  Sargent also has served on the Audit, Governance & Nominating, and Human

23  Resources Committees of Wells Fargo's Board.  In 2022, Sargent received director's fees

24  consisting of cash and stock awards worth $397,519.  On information and belief, Sargent is a

25  citizen of Massachusetts.

26        34.    Defendant Suzanne M. Vautrinot ("Vautrinot") has been a director of Wells Fargo

27  since February 2015.  Vautrinot also has served on the Corporate Responsibility and Risk

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT -             - 9

Committees of Wells Fargo's Board.  In 2022, Vautrinot received director's fees consisting of cash and stock awards worth $355,269.  On information and belief, Vautrinot is a citizen of Colorado.

**Officers**

35.    Defendant Charles W. Scharf ("Scharf") has been Chief Executive Officer ("CEO") and President of Wells Fargo since October 2019.  He also has served as a director of Wells Fargo and Wells Fargo Bank, N.A. since October 2019.  In 2022, Scharf received cash, stock awards, and non-equity incentive compensation worth over $24.6 million.  On information and belief, Scharf is a citizen of New York.

36.    Defendant Michael P. Santomassimo ("Santomassimo") has been Senior Executive Vice President and Chief Financial Officer ("CFO") of Wells Fargo since October 2020.  In this capacity, at all relevant times, Santomassimo was responsible for Wells Fargo's financial management functions including financial planning and analysis and asset-liability management. He is also responsible for Wells Fargo's investment portfolios and corporate development. Santomassimo is also a member of the Operating Committee of Wells Fargo.  In 2022, Santomassimo received cash, stock awards, and non-equity incentive compensation worth over $12.8 million.  On information and belief, Santomassimo is a citizen of New Jersey.

37.    Defendant Scott E. Powell ("Powell") has been Senior Executive Vice President and Chief Operating Officer of Wells Fargo since December 2019.  In this capacity, at all relevant times, Powell's areas of responsibility included Wells Fargo's operations, control executions, strategic execution, business continuity and resiliency, and regulatory relations.  Powell is also a member of the Operating Committee of Wells Fargo.  In 2022, Powell received cash, stock awards, and non-equity incentive compensation worth over $10.4 million.  On information and belief, Powell is a citizen of New York.

38.    Defendant Derek A. Flowers ("Flowers") has been Senior Executive Vice President and Chief Risk Officer of Wells Fargo since January 2022.  In this capacity, at all relevant times, Flowers' area of responsibility included Wells Fargo's corporate governance and risk programs, including compliance risk management relating to Wells Fargo's operations.  Before July 2020, Flowers served as Senior Executive Vice President and Head of Strategic Execution and

1 Operations from June 2019 to January 2022, and as Executive Vice President and Chief Credit and

2 Market Risk Officer from July 2016 to June 2019.  Flowers is also a member of the Operating

3 Committee of Wells Fargo.  He has served with Wells Fargo or its predecessors for 24 years.  On

4 information and belief, Flowers is a citizen of North Carolina.

5       39.    Defendant Muneera S. Carr ("Carr") has been Executive Vice President, Chief

6 Accounting Officer, and Controller of Wells Fargo since March 2020.  In this capacity, at all

7 relevant times, Carr was responsible for Wells Fargo's controllership activities such as financial

8 controls and oversight and related policies and processes for Wells Fargo's business groups and

9 enterprise functions.  On information and belief, Carr is a citizen of Texas.

10 **Former Directors and Officers**

11       40.    Defendant Elizabeth A. Duke ("Duke") served as director of Wells Fargo from

12 January 2015 until March 2020.  Duke served on the Credit, Finance, Governance & Nominating,

13 and Risk Committees of Wells Fargo's Board.  She also served as Chair of the Wells Fargo Board.

14 In her last full year of service on Wells Fargo's Board, 2019, Duke received director's fees

15 consisting of cash and stock awards worth $635,025.  On information and belief, Duke is a citizen

16 of Virginia.

17       41.    Defendant Juan A. Pujadas ("Pujadas") served as director of Wells Fargo from

18 September 2017 until April 2023.  Pujadas served on the Credit, Finance, and Risk Committees of

19 Wells Fargo's Board.  In 2022, Pujadas received director's fees consisting of cash and stock awards

20 worth $367,769.  On information and belief, Pujadas is a citizen of New York.

21       42.    Defendant Charles H. Noski ("Noski") served as director of Wells Fargo from June

22 2019 until September 2021.  Noski served on the Audit and Governance & Nominating

23 Committees of Wells Fargo's Board.  In 2021, Noski received director's fees consisting of cash

24 and stock awards worth $443,504.  On information and belief, Noski is a citizen of California.

25       43.    Defendant Donald M. James ("James") served as director of Wells Fargo from

26 January 2009 until April 2021.  James served on the Finance, Governance & Nominating, and

27 Human Resources Committees of Wells Fargo's Board.  In 2020, James received director's fees

28

consisting of cash and stock awards worth $374,004.  On information and belief, James is a citizen of Alabama.

44.     Defendant Timothy J. Sloan ("Sloan") served as Wells Fargo's CEO from October 2016 until March 2019.  In his last year at Wells Fargo, 2019, Sloan received cash, stock awards, and non-equity incentive compensation worth over $16.6 million.  On information and belief, Sloan is a citizen of California.

45.     Defendant John R. Shrewsberry ("Shrewsberry") served as Wells Fargo's Senior Vice President and CFO from May 2014 until fall 2020.  In 2020, Shrewsberry received cash, stock awards, and non-equity incentive compensation worth over $7.9 million.  On information and belief, Shrewsberry is a citizen of California.

46.     Defendant C. Allen Parker ("Parker") served as Wells Fargo's General Counsel from March 2017 until March 2019.  He also served as Wells Fargo's Interim CEO from March 2019 until October 2019.  In 2019, Parker received cash, stock awards, and non-equity incentive compensation worth over $9.6 million.  On information and belief, Parker is a citizen of New York.

**THE FIDUCIARY DUTIES OF WELLS FARGO DIRECTORS AND OFFICERS**

47.     Each director and officer of Wells Fargo owed Wells Fargo and its shareholders the duty to exercise a high degree of care, loyalty, and diligence in the management and administration of the affairs of Wells Fargo, as well as in the use and preservation of its property and assets.  The conduct of Wells Fargo's directors and officers complained of herein involves bad faith, knowing, intentional, and culpable violation of their obligations as directors and officers of Wells Fargo and the absence of good faith on their part for their duties to Wells Fargo and its shareholders.  The misconduct of Wells Fargo's officers has been ratified by Wells Fargo's Board, which has failed to take any legal action on behalf of the Company against them.

48.     By reason of their positions as directors, officers, and/or fiduciaries of Wells Fargo and because of their ability to control the business and corporate affairs of Wells Fargo, defendants each owed Wells Fargo and its shareholders fiduciary obligations of candor, trust, loyalty, and care, and were required to use their ability to control and manage Wells Fargo in a lawful and

1    honest manner, and to act in furtherance of the best interests of Wells Fargo and its shareholders

2    so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

3          49.     In addition, as directors and/or officers of a publicly held company, defendants had

4    a duty to promptly disseminate accurate and truthful information with respect to Wells Fargo's

5    legal compliance, including remediation of its faulty risk-management infrastructure, as required

6    by Consent Orders entered into by the Wells Fargo Board on Wells Fargo's behalf.  Moreover,

7    defendants had a duty to speak truthfully whenever they spoke about Wells Fargo, including about,

8    among other things, Wells Fargo's business, operations, non-discrimination policies and practices,

9    projections, and forecasts.

10         50.     Defendants, because of their positions of control and authority as directors and/or

11   officers of Wells Fargo, were able to and did, directly and indirectly, control the wrongful acts

12   complained of herein.  Because of their directorial and executive positions with Wells Fargo, each

13   defendant had access to adverse non-public information about the legal compliance, risk-

14   management and remediation infrastructure and programs, financial condition, operations, and

15   future business prospects of Wells Fargo, and was required to disclose it promptly and accurately

16   to Wells Fargo's shareholders and the financial markets but did not do so.

17         51.     To discharge their duties, the directors and officers of Wells Fargo were required

18   to exercise reasonable and prudent supervision over the management, policies, practices, and

19   controls of the business and financial affairs of Wells Fargo.  By virtue of such duties, the directors

20   and officers of Wells Fargo were required, among other things, to: (i) manage, conduct, supervise,

21   and direct the business affairs of Wells Fargo in accordance with the law (including Consent

22   Orders with Wells Fargo's regulators, federal and state consumer protection and consumer

23   financial protection laws, and laws prohibiting discrimination in banking and fair housing),

24   government rules and regulations, and Wells Fargo's charter and bylaws; (ii) neither violate nor

25   knowingly permit any director, officer, or employee of Wells Fargo to violate applicable laws,

26   rules, and regulations; (iii) remain informed as to the status of Wells Fargo's legal compliance and

27   operations, and upon receipt of notice or information of imprudent, unlawful, or unsound practices,

28   to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT -                                              - 13

1   or practices and make such disclosures as are necessary to comply with their duty of candor to

2   Wells Fargo's regulators and shareholders; (iv) establish and maintain systematic and accurate

3   records and reports of the business and affairs of Wells Fargo and procedures for the reporting of

4   the business and affairs to the Wells Fargo Board and to periodically investigate, or cause

5   independent investigation to be made of, said reports and records; (v) maintain and implement an

6   adequate, functioning system of internal legal, financial, and accounting controls, such that Wells

7   Fargo's financial statements would be accurate and the actions of its directors and officers would

8   be in accordance with all applicable laws; (vi) exercise reasonable control and supervision over

9   public statements to the securities markets and trading in Wells Fargo stock by the directors,

10  officers, and employees of Wells Fargo; and (vii) supervise the preparation and filing of any

11  financial reports or other information required by law and the Consent Orders from Wells Fargo

12  and to examine and evaluate any reports of examinations, audits, or other financial information

13  concerning the financial affairs of Wells Fargo and to make full and accurate disclosure of all

14  material facts concerning, among other things, each of the subjects and duties set forth above.

15        52.    At relevant times each defendant occupied a position with Wells Fargo or was

16  associated with Wells Fargo in such a manner as to make them privy to confidential and proprietary

17  information concerning Wells Fargo and its operations, finances, and financial condition.  Because

18  of these positions and such access, each defendant knew that the true facts specified herein

19  regarding Wells Fargo's legal compliance, business, and finances had not been disclosed to and

20  were being concealed from its shareholders and the public.  Defendants, as corporate fiduciaries

21  entrusted with non-public information, were obligated to disclose material adverse information

22  regarding Wells Fargo and to take all action necessary to ensure that the officers and directors of

23  Wells Fargo did not act upon such non-public information in a manner which caused Wells Fargo

24  to violate the law.

25        53.    Defendants breached their duties of loyalty and good faith by misrepresenting,

26  among other things, Wells Fargo's legal compliance and risk remediation activities.  Each

27  defendant participated in the issuance and/or review of false and/or misleading statements,

28  including the preparation of false and/or misleading press releases, SEC filings, and reports to

1    Wells Fargo shareholders.  In addition, because of defendants' illegal actions and course of

2    conduct, Wells Fargo has been and/or is now the subject of costly and expensive-to-defend

3    lawsuits, investigations, and regulatory proceedings.  As a result, Wells Fargo has expended and

4    will continue to expend significant sums of money.  Moreover, these actions have irreparably

5    damaged Wells Fargo's corporate image and goodwill.

6    <center>**SUBSTANTIVE ALLEGATIONS**</center>

7    54.    This is a shareholder derivative action on behalf of Wells Fargo.  Wells Fargo is

8    the fourth-largest bank in the United States but is best known for its culture of corruption and litany

9    of corporate malfeasance.  Plaintiffs seek to hold defendants, Wells Fargo's top leadership,

10   accountable for breach of fiduciary duty and violations of law related to its widespread abuse of

11   its customers and depositors.

12   **Wells Fargo's Rise to Mega-Bank Status**

13   55.    "Big things have small beginnings."  The famous quote taken from *Lawrence of*

14   *Arabia* tells Wells Fargo's story – how a small banking outfit became a giant mega-bank, one

15   known worldwide as a recidivist law-breaker.

16   56.    In 1996, Wells Fargo acquired First Interstate Bancorp for $11.6 billion.  Two years

17   later, in 1998, Norwest Corporation acquired Wells Fargo, with the combined company taking the

18   Wells Fargo name.  In 1999, the newly constituted Wells Fargo acquired 13 companies with total

19   assets of $2.4 billion.

20   57.    In 2000, Wells Fargo acquired First Security Corporation, making Wells Fargo the

21   largest bank based on deposits in Idaho, Nevada, New Mexico, and Utah.  Wells Fargo also became

22   the largest bank in the West overall with total assets of $263 billion.  In 2000, Wells Fargo also

23   acquired National Bank of Alaska, further expanding its presence on the West Coast.

24   58.    After a brief respite, Wells Fargo resumed its growth-by-acquisition strategy in

25   2007.  In January 2007, Wells Fargo acquired Placer Sierra Bank.  In May 2007, Wells Fargo

26   acquired Greater Bay Bancorp.  In June 2007, Wells Fargo acquired CIT's construction unit, which

27   Wells Fargo rebranded "Wells Fargo Construction," a division of Wells Fargo Equipment Finance.

28

1   In January 2008, Wells Fargo acquired United Bancorporation of Wyoming.  And, in August 2008,

2   Wells Fargo acquired Century Bancshares of Texas.

3   59.   Amidst the financial crisis, in October 2008, Wells Fargo acquired Wachovia

4   Corporation for $15.1 billion.  The merger created a mega-bank with $1.4 trillion in assets and 48

5   million customers and expanded Wells Fargo's operations into nine Eastern and Southern states.

6   As a part of the Wachovia acquisition, Wells Fargo also acquired a capital markets group, which

7   it publicly unveiled in 2009 as "Wells Fargo Securities."  Before that point, Wells Fargo had little,

8   if any, participation in investment banking activities.

9   60.   Today, only JPMorgan Chase, Bank of America, and Citigroup eclipse Wells Fargo

10  in size.  Wells Fargo serves more than 64 million customers across the country.  As of June 2023,

11  Wells Fargo's market capitalization exceeded $151.7 billion.

12  **Wells Fargo's Scandalous History of Lawlessness**

13  61.   Wells Fargo has a long history of corruption and scandal.  In the eyes of some,

14  including ranking members of Congress, Wells Fargo is a corporation too big to govern and operate

15  lawfully.   The remedy, these Congressional critics say, is to dismantle Wells Fargo to protect

16  consumers from harm.  This is not just over-heated rhetoric, devoid of fact.  Even a cursory review

17  of the record reveals that Wells Fargo abuses its customer accounts, depositors, military service

18  members, and qualified under-represented mortgage loan applicants and borrowers across multiple

19  product lines.

20  62.   For example, in July 2012, Wells Fargo paid $234 million in a deal with the DOJ

21  to settle charges that it discriminated against qualified African American and Hispanic borrowers

22  in its mortgage lending.  Between 2004 through 2009, Wells Fargo discriminated by steering 4,000

23  qualified African American and Hispanic wholesale and retail borrowers into subprime mortgages

24  when non-Hispanic white borrowers with similar credit profiles received prime loans.

25  63.   In 2016, Wells Fargo paid $185 million to resolve legal liability arising from its

26  customer "fake accounts" scandal, in which branch employees, at the behest of corporate

27  leadership, opened over 3.5 million fake accounts and credit cards to meet sales quotas.  As a part

28  of the settlement, Wells Fargo paid a $100 million penalty to the CFPB for the fraudulently opened

accounts, then the largest such penalty the CFPB had issued.  Additionally, Wells Fargo paid $50 million to the City and County of Los Angeles and $35 million to the Office of the Comptroller of the Currency ("OCC").  Separately, a short time later, Wells Fargo paid an additional $110 million to compensate customers affected by the "fake accounts" scandal.  All tolled the "fake accounts" scandal plunged Wells Fargo's trust rating to below even Enron's at its nadir.

64.     In September 2016, Wells Fargo agreed to pay $4 million to resolve claims that it violated the Servicemembers Civil Relief Act ("SCRA").  Between January 2008 and July 2015, Wells Fargo repossessed about 400 service members' cars without proper process.  As a part of the settlement, Wells Fargo also agreed to change its policies concerning repossession of cars owned by service members and to comply with the SCRA.  After the 2016 settlement, the DOJ identified additional violations of the SCRA involving about 450 service members.  In November 2017, Wells Fargo paid an additional $5.4 million to resolve claims for unlawfully repossessing the service members' vehicles.

65.     In April 2018, Wells Fargo paid $1 billion in fines to the CFPB for unethical conduct in its mortgage and auto loan business.  The CFPB found that Wells Fargo violated the Consumer Financial Protection Act ("CFPA") by charging some customers too much mortgage interest rate-lock extensions and by running a mandatory insurance program that added insurance costs and fees into some borrowers' auto loans.  As a part of the resolution, the OCC assessed a $500 million civil penalty against Wells Fargo, inclusive of the $1 billion fine, for severe deficiencies the OCC found in Wells Fargo's "enterprise-wide compliance risk management program."  These deficiencies, the OCC said, "constituted reckless, unsafe or unsound practices and resulted in violations of the unfair acts or practices provision of Section 5 of the Federal Trade Commission Act."  Additionally, the OCC found that Wells Fargo "violated the FTC Act and engaged in unsafe and unsound practices relating to improper placement and maintenance of collateral protection insurance policies on auto loan accounts and improper fees associated with interest rate lock extensions."  "These practices resulted in consumer harm which the OCC has directed the bank to remediate," the OCC said.

66.    In August 2018, Wells Fargo paid a $2.09 billion settlement for its role in the 2008 housing crisis.  The DOJ said that Wells Fargo lied to investors about the creditworthiness of the mortgage loans it sold to them.  As a result, investors, including federally insured financial institutions, suffered billions of dollars in losses from investing in residential mortgage-backed securities containing loans originated by Wells Fargo.  Despite "its knowledge that a substantial portion of its stated income loans contained misstated income, Wells Fargo failed to disclose this information, and instead reported to investors false debt-to-income ratios in connection with the loans it sold," according to federal law enforcement.  "Wells Fargo also allegedly heralded its fraud controls while failing to disclose the income discrepancies its controls had identified," the DOJ said.

67.    In February 2020, Wells Fargo agreed to a $3 billion deal with regulators to settle civil and criminal liability stemming from the "fake accounts" debacle.  As a part of the settlement, "Wells Fargo admitted that it collected millions of dollars in fees and interest to which [Wells Fargo] was not entitled, harmed the credit ratings of certain customers, and unlawfully misused customer' sensitive personal information, including customers' means of identification."

68.    In September 2021, Wells Fargo paid $72.6 million in a deal with the DOJ to settle charges that it overcharged hundreds of currency exchange customers.  Between 2010 and 2017, "Wells Fargo FX sales specialists defrauded 771 customers by systematically charging them higher markups on FX transactions than they represented the Bank would charge, and concealing these overcharges through various misrepresentations and deceptive practices."  Wells Fargo's deceptive FX sales practices violated the Financial Institutions Reform, Recovery, and Enforcement Act.  As a part of the settlement, Wells Fargo admitted "that many FX sales specialists overcharged hundreds of commercial customers by applying larger sales margins or spreads than they represented they would, and that, in certain instances, when customers contacted the Bank to inquire about higher-than-agreed-upon pricing, FX sales specialists would give customers false explanations for the inflated prices."

**Consent Orders Spotlight Wells Fargo's**
**General Lawlessness for Its Leadership**

69.     Banking is highly regulated.  Under myriad laws, rules and regulations, banks, like Wells Fargo, shall "maintain a risk committee" and maintain a "global risk-management framework . . . commensurate with its structure, risk profile, complexity, activities, and size." Regulation YY, 12 C.F.R. §252.33.  To address Wells Fargo's seemingly endless violations of financial consumer protection laws, its regulators, including the CFPB, the Board of Governors of the U.S. Federal Reserve System ("Federal Reserve"), and the OCC, required Wells Fargo to enter numerous Consent Orders.  The Consent Orders required Wells Fargo to fix its risk infrastructure and bring its regulatory compliance, risk mitigation, and risk remediation programs into alignment with applicable laws.

70.     For example, in September 2016, in connection with its "fake accounts" settlement with Wells Fargo, the CFPB ordered Wells Fargo to fix its sales practices (the "2016 CFPB Order").  The 2016 CFPB Order required Wells Fargo to hire a consultant to review its sales practices and for Wells Fargo to use the consultant's report to develop a comprehensive compliance plan to remedy deficiencies in its sales operations.  Under the 2016 CFPB Order, Wells Fargo was to submit the compliance plan to the CFPB for a determination of non-objection after the Wells Fargo Board had reviewed the compliance plan and all other submissions to be submitted to the CFPB under the 2016 CFPB Order.  The 2016 CFPB Order also explicitly stated that Wells Fargo's "Board will have the ultimate responsibility for proper and smooth management of [Wells Fargo] and for ensuring that [Wells Fargo] complies with Federal consumer financial law and this Consent Order."  2016 CFPB Order at 22.

71.     In February 2018, the Federal Reserve, troubled by Wells Fargo's ongoing violations of consumer financial protection law, also sanctioned Wells Fargo (the "2018 FRB Order").  The Federal Reserve cited, among other things, Wells Fargo's failure to ensure that "senior management had established and maintained an adequate risk management framework commensurate with the size and complexity of [Wells Fargo], which resulted in weak compliance practices," as a basis for the 2018 FRB Order.  2018 FRB Order at 2.  The 2018 FRB Order was

1 | signed by defendants Clark, Craver, James, Morris, Pujadas, Sargent, Vautrinot, Duke, Sloan, and
2 | other high-ranking Wells Fargo executives.

3 |     72.     To remediate this deficiency, the 2018 FRB Order required Wells Fargo to, among
4 | other things, "adopt an improved firmwide risk management program to identify and manage risks
5 | across the consolidated organization."  2018 FRB Order at 1.  Additionally, after Wells Fargo
6 | adopted a Board Effectiveness and Risk Management Plan, Wells Fargo was to "conduct and
7 | complete by an appropriate date no later than September 30, 2018, an independent review of" the
8 | Board Effectiveness and Risk Management Plan.  *Id.* at 7.  In an unprecedented action, the Federal
9 | Reserve placed an asset cap on Wells Fargo freezing its balance sheet to $1.95 trillion.  The asset
10 | cap prohibits Wells Fargo from growing its balance sheet, a main way banks make money.  The
11 | limit remains in place today and, so far, Wells Fargo reportedly has lost $4 billion in profits.

12 |     73.     In April 2018, the OCC also took remedial action against Wells Fargo.  In
13 | connection with its $500 million settlement with Wells Fargo over the latter's unethical mortgage
14 | and auto loan business practices, the OCC required Wells Fargo to agree to additional oversight
15 | of compensation paid to certain senior Wells Fargo employees (the "2018 OCC Order").
16 | Specifically, Wells Fargo had to first obtain supervisory non-objection from the Deputy
17 | Comptroller before such payments could be made.  2018 OCC Order at 2.  Additionally, the 2018
18 | OCC Order documented Wells Fargo's numerous legal compliance failures in formal findings.
19 | Among other things, the OCC found that "[s]ince at least 2011, [Wells Fargo] has failed to
20 | implement and maintain a compliance risk management program commensurate with [Wells
21 | Fargo's] size, complexity and risk profile," resulting in "reckless unsafe or unsound practices and
22 | violations of law."  *Id.*

23 |     74.     To remediate these problems, the OCC ordered Wells Fargo to take certain steps to
24 | discharge its obligations under the 2018 OCC Order.  These include, among other things:
25 | (i) requiring the Wells Fargo Board to "appoint and maintain an active Compliance Committee"
26 | "responsible for monitoring and overseeing [Wells Fargo's] compliance with the provisions of [the
27 | 2018 OCC Order]"; (ii) requiring Wells Fargo to develop and submit to the OCC a Compliance
28 | Risk Management Plan "containing a complete description of the actions that are necessary and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT -                                    - 20 -

1  appropriate to achieve compliance" by Wells Fargo with the 2018 OCC Order; (iii) requiring Wells

2  Fargo to develop "a plan to enhance Internal Audit's program with respect to compliance"; and

3  (iv) requiring the Wells Fargo Board to "ensure that [Wells Fargo] has processes, personnel, and

4  control systems to ensure implementation of and adherence to the plans, programs, policies, and

5  procedures required by [the 2018 OCC Order]."  2018 OCC Order at 5-22.

6            75.    In April 2018, the CFPB and Wells Fargo Board agreed to a separate remedial order

7  (the "2018 CFPB Order") adjacent to the 2018 OCC Order above.  Under the 2018 CFPB Order,

8  Wells Fargo promised to, among other things, form a Compliance Committee and adopt an

9  "acceptable enterprise-wide Compliance Risk Management Plan . . . designed to ensure that [Wells

10 Fargo's] acts and practices comply with Federal Consumer Financial Law and the terms of [the

11 2018 CFPB Order]."  2018 CFPB Order at 13.  As a part of the 2018 CFPB Order, the Wells Fargo

12 Board also agreed to "review all submissions . . . required by this Consent Order before submission

13 to the [CSFB]" and ensure "that [Wells Fargo] complies with Federal Consumer Financial Law

14 and this Consent Order, including successful execution of the Plans."  *Id.* at 16-17.

15           76.    In June 2018, the SEC issued a cease-and-desist order against Wells Fargo for its

16 unlawful sales practices in its Market-Linked Investments ("MLI") business.  To earn more fees

17 for Wells Fargo, its sales personnel advised customers to flip MLIs.  This tawdry practice garnered

18 Wells Fargo more than $930,000 in ill-gotten gains, which Wells Fargo ultimately returned.  Wells

19 Fargo also agreed to pay a $4 million penalty to resolve the SEC's enforcement action.

20           77.    The legal implications of the Consent Decrees on Wells Fargo's Board and each of

21 its members is unmistakable.  They alerted the directors to serious legal compliance problems at

22 Wells Fargo and assigned responsibility for fixing them to the Wells Fargo Board.  The Board's

23 job under the Consent Decrees was straightforward:  fix Wells Fargo's broken culture and repair

24 its risk infrastructure by adopting risk-management procedures and programs commensurate with

25 Wells Fargo's structure, risk profile, complexity, activities, and size.  But rather than remedy Wells

26 Fargo's legal non-compliance, Wells Fargo's directors did the unimaginable – nothing.  As a result,

27 the absence of risk management infrastructure and legal compliance continued and later cost Wells

28 Fargo nearly $5 billion in additional settlement payments.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT -                                    - 21 -

**Wells Fargo's Misrepresents Its**
**Compliance with the Consent Orders**

78.     In the wake of the Consent Decrees, borne of Wells Fargo's abuse of its customers, depositors, and others, Wells Fargo embarked on a public relations campaign.  The purpose of the campaign was to convince Wells Fargo shareholders and stakeholders that the Board and top leadership understood the need for reform and remediation and was expeditiously adopting risk management infrastructure and initiatives commensurate with Wells Fargo's complexity, size, and risk profile – although, in fact, they were not.

79.     For example, in Wells Fargo's 2018 proxy statement released on March 14, 2018, defendants Clark, Craver, Duke, James, Morris, Pujadas, Sargent, Sloan, and Vautrinot stated: "Wells Fargo is committed to a thorough review of the products we offer and the internal procedures we use to get things done.  When we uncover anything that may be questionable, we address it and remediate any customers who may have been financially harmed."  "To strengthen Wells Fargo's corporate culture," these defendants said, "we are listening to our team members and inviting outside reviewers to help identify enhancements so we can make sure our culture is consistent across the organization."

80.     Similarly, in Wells Fargo's 2019 proxy statement released on March 13, 2019, the members of the Wells Fargo's Board stated:  "The Board is focused on making progress across key priorities as we work to transform Wells Fargo, meet the expectations of our regulators, and rebuild trust with our stakeholders."   Continuing, the Board identified as "key priorities":  (i) "Satisfying regulatory expectations and the requirements of the Company's outstanding consent orders with its regulators"; (ii) "Enhancing our risk and reporting systems to meet the heightened regulatory expectations for systemically important financial institutions and our own goal of industry leadership in risk management"; (iii) "Engaging in frequent and open communication with our regulators about our progress"; (iv) "Improving the Company's risk management program"; (v) "Implementing plans to continue building our operational and compliance risk management systems to a level that matches our business, structure, and strategies"; (vi) "Enhancing management-level governance committee structures, oversight, monitoring and

controls, and escalation processes and procedures"; (vii) "Improving control testing and monitoring functions and reducing the number and complexity of our business processes in order to offer the potential for improving the efficiency and effectiveness of core operations"; and (viii) "Continuing to assess and shape the Company's culture with an emphasis on ethics, training and development, and diversity and inclusion."

81.     Further, in Wells Fargo's 2020 proxy statement released on March 16, 2020, the Wells Fargo Board stated:  "Under new leadership, Wells Fargo is moving with a sense of urgency to remediate our historical issues and establish the strong foundation necessary to regain the trust of all stakeholders and position the Company for the future. . . .  Going forward, we recognize it is imperative that we maintain the highest standards of operational excellence and integrity.  We have made significant changes to our governance, management, structure, processes, and culture over the past year. . . .  In addition to overseeing the centralization of Wells Fargo's organizational structure, the strengthening of its risk management program and the development of its strategy, the Board is focused on holding management accountable for implementing our strategy consistent with our risk management framework and executing on our regulatory commitments."

82.     The Board, focusing on Wells Fargo's legacy of legal non-compliance, added: "The Board, our CEO, and management are focused on moving with a sense of urgency to strengthen our risk and control foundation and address outstanding regulatory matters. . . .  We are changing the way we run the Company and our culture in order to: . . . Operate as one company, not a series of decentralized businesses. . . .  Foster a culture of partnership, but drive toward decisions. . . .  Expect high quality execution with clear responsibility and accountability. . . . Judge ourselves based upon our outcomes, not our words."

83.     These statements were false and misleading because, in truth, the Wells Fargo Board's focus was not on addressing the compliance failures identified by regulators, but rather on earnings.  Neither the Wells Fargo Board nor management took seriously their obligations to fix Wells Fargo's broken compliance infrastructure, choosing instead to focus on earnings and other financial matters.

**Congressional Hearings Expose the
Wells Fargo Board's Dereliction of Duty**

84.    In early 2020 the truth began to emerge.  A Congressional investigation into Wells Fargo's customer abuses and violations of financial consumer protection laws exposed the fact that Wells Fargo's public commitments to legal compliance and reform and remediation were lip service.  The investigation confirmed the Wells Fargo Board's inactivity and inattention to the Consent Decrees, and instead Wells Fargo's singular focus on of profits.  The Majority staff of the U.S. House Financial Services Committee found in its extensive report that: (i) "Wells Fargo's board of directors failed to ensure management could competently address the Company's risk management deficiencies"; (ii) "Wells Fargo's board of directors allowed management to repeatedly submit materially deficient plans to regulators in response to the consent orders"; (iii) "both Wells Fargo's board and management prioritized financial and other considerations above fixing the issues identified by regulators"; (iv) Wells Fargo's board did not hold senior management accountable for repeatedly failing to meet regulators' expectations"; (v) "former Wells Fargo CEO Timothy J. Sloan gave inaccurate and misleading testimony to Congress during a March 2019 Committee hearing"; and (vi) "the potential for widespread consumer abuse still remains at Wells Fargo."  Majority Report at 4-5, 8-9, 73-74.

85.    The Majority Report also found a "prolonged failure of Wells Fargo's board and management to satisfy the terms of the consent orders and establish the safeguards necessary to protect consumers from harm," and that "Wells Fargo's board failed to hold senior management accountable for the Bank's lack of progress under the consent orders, despite the performance concerns raised by regulators and certain board members."  Majority Report at 8-9.  Additionally, the Majority Report found that Wells Fargo "focused on profits and exiting the regulators' consent orders rather than on fixing the Bank's long-standing compliance management weaknesses."  *Id.* at 74.  "Rather than developing adequate plans in response to the 2018 Federal Reserve Consent Order, Wells Fargo's board and senior management concentrated their efforts on lifting the asset cap," the Majority Report said.  *Id.*

86.     Further, the Majority Report found that the Wells Fargo Board failed to fix Wells Fargo's legal compliance deficiencies, by making harmed customers whole and ensuring that Wells Fargo had in place risk-management and remediation programs commensurate with its complexity, risk, and size.  Majority Report at 74.  The Wells Fargo Board also "resisted the regulators' admonishment to hold executives accountable for the Bank's poor performance in terms of resolving outstanding regulatory issues," according to the House investigators.  *Id*.

87.     Based on these and other damning findings, the Majority Report concluded that Wells Fargo "continues to struggle to implement effective risk management and remediation programs when compliance breakdowns occur, that Wells Fargo's board and management repeatedly have failed to demonstrate that the Bank can establish a compliance management infrastructure capable of preventing consumer abuses, and that Wells Fargo's leadership has been unable to change the Bank's culture."  Majority Report at 73-74.  Revelations that Wells Fargo had overstated the pace and progress of its remediation activities invited additional regulatory scrutiny and stunned shareholders.

**Wells Fargo's Pays Record-Breaking Settlements**

88.     Once the truth fully emerged in 2022, Wells Fargo was forced to pay a huge price.  On December 20, 2022, Wells Fargo paid $3.7 billion in a deal with the CFPB to settle charges that it took advantage of customers on their auto loans, home mortgages, and bank accounts.  Wells Fargo, the CFPB said, wrongfully repossessed people's cars and took actions that resulted in borrowers wrongfully losing their homes.  Additionally, Wells Fargo charged improper overdraft fees on checking accounts, further harming customers, according to an order issued by the CFPB.

89.     The settlement requires Wells Fargo to pay $2 billion to millions of customers who were harmed by Wells Fargo's wrongdoing which stretches back for many years, according to the CFPB.  Wells Fargo shall also pay a $1.7 billion fine for its unlawful consumer and banking practices.

90.     Shortly after the CFPB settlement, on May 23, 2023, Wells Fargo agreed to pay an additional $1 billion to settle a class action lawsuit alleging it misled shareholders about Wells Fargo's ability to recover from the "fake-accounts" scandal.  The shareholder plaintiffs alleged

that Wells Fargo misrepresented the speed at which it was addressing and fixing faulty risk-management systems that allowed Wells Fargo's sales staff to open 3.5 million fake customer accounts.

**New Scandals Raise Fresh Doubts About**
**Wells Fargo's Commitment to Legal Compliance**

91.     Despite recently paying $4.7 billion in settlements, Wells Fargo's lawless ways continue.  Recent news reports indicate renewal of Wells Fargo's alleged discriminatory home loan lending practices, prompting a wave of discriminatory lending lawsuits against the Company.

92.     On March 10, 2022, a *Bloomberg* investigation found that Wells Fargo rejected half of its African American applicants seeking to refinance home mortgages.  Among major lenders, like Bank of America and JPMorgan Chase, "only Wells Fargo approved a smaller share of refinancing applications from Black homeowners in 2020 than a decade earlier," the *Bloomberg* report said.  By contrast, *Bloomberg*'s analysis showed that Wells Fargo approved 72% of white mortgage applicants in the same period.  Amiah Taylor, *Wells Fargo rejected nearly half of their Black homeowners refinancing applications*, Yahoo.com (Mar. 16, 2022), https://finance.yahoo.com/news/wells-fargo-rejected-nearly-half-215359468.html.

93.     As a *Forbes* headline bluntly put it, reporting on *Bloomberg*'s findings in an article titled "Wells Fargo Is Taking A Hard Pass On 53% of Black Mortgage Applicants":

> Wells Fargo, the nation's third largest bank by assets, is stifling Black homeownership by rejecting refinance applications sent in by Black homeowners, while approving almost three-quarters of those sent in by white applicants.  A Bloomberg analysis found that Wells Fargo's 47% approval rate gave it the worst record among major lenders when considering refinancing for Black homeowners.  Homeownership is still one of the main avenues for all Americans to build wealth, though the national rate of Black homeowners stands at 41%.  With nearly $200 billion lost in wealth and equity since the Great Recession, African Americans are at risk to have all median wealth extinguished by 2053, and Wells Fargo gamesmanship with mortgage applications will only make things worse.

Kori Hale, *Wells Fargo Is Taking A Hard Pass On 53% of Black Mortgage Applicants*, Forbes.com (June 7, 2022), https://www.forbes.com/sites/korihale/2022/06/07/wells-fargo-is-taking-a-hard-pass-on-53-of-black-mortgage-applicants/?sh=2f00c3243135.

94.     Wells Fargo's alleged discriminatory home loan lending practices has prompted litigation.   Several African American home mortgage applicants recently filed costly and

1  expensive-to-defend class action and individual lawsuits against Wells Fargo alleging racial

2  discrimination in violation of both federal and state anti-discrimination laws.  One such lawsuit

3  involves Brigid and Joseph Washington, African American homeowners.  In September 2022, the

4  Washingtons sued Wells Fargo for federal civil rights and fair credit and housing violations in

5  federal court in Greensboro, North Carolina.  On January 25, 2023, Judge Catherine C. Eagles of

6  the U.S. District Court for the Middle District of North Carolina ruled that Wells Fargo must face

7  certain of the African American plaintiffs' claims.  *Washington v. Wells Fargo Bank Nat'l Ass'n*,

8  2023 WL 415483 (M.D.N.C. Jan. 25, 2023).  A jury trial is set for January 8, 2024.

9         95.     Wealthy African American applicants fared no better when seeking mortgages from

10  Wells Fargo.  Wells Fargo denied mortgage applications for this well-to-do cohort at increased

11  rates as well.  According to *Bloomberg*'s analysis:

> Wells Fargo's application approval rates for the lowest income white families – earning a maximum of $63,000 per year – were nearly identical to high income Black families – earning a minimum of $168,000 per year.  But when Black and white families had the same low income status of a $63,000 maximum annual income, white families were almost twice as likely to be approved.

15  Amiah Taylor, *Wells Fargo rejected nearly half of their Black homeowners refinancing*

16  *applications*, Yahoo.com (Mar. 16, 2022), https://finance.yahoo.com/news/wells-fargo-rejected-

17  nearly-half-215359468.html.  Wells Fargo's alleged discriminatory lending practices against

18  wealthy African Americans have resulted in costly and expensive-to-defend litigation against the

19  bank as well.  *See, e.g.*, *Braxton v. Wells Fargo Bank, N.A.*, No. 3:22-cv-01748-JD (N.D. Cal. filed

20  Mar. 18, 2022).  The *Los Angeles Times* recently chronicled plaintiff Gia Gray's experience with

21  Wells Fargo, writing:

> Gray seems like a dream client for any bank: a well-off family doctor living in an exclusive Bay Area town, in a 5,000-square-foot mansion with a master bath bigger than my office.

> With a credit score topping 800, she expected little drama when she and her husband decided to refinance their Danville home and two other investment properties in 2020 to capture some of the lowest interest rates in recent history – remember when 3% loans were a thing?

> But after endless excuses and delays in her applications, "I started feeling Black," Gray told me.  Her bank, Wells Fargo, flat out turned her down on the investment properties, she said, and slow-rolled the application on her residence, coming up with new requirements as the process dragged on.

"At the visceral level, I felt that something was not right," she said.

Anita Chabria, *Column: Wells Fargo denied well-off borrowers low-interest loans.  Is it because they're Black?*, Los Angeles Times (May 25, 2023), https://www.latimes.com/ california/story/2023-05-25/wells-fargo-denied-borrowers-loans-is-it-because-they-are- black.

96.     Also, on June 10, 2022, *Barron's* reported "the Manhattan U.S. attorney's office [is] in the early stages of a criminal probe" into Wells Fargo's "fake diversity interviews."  Kenneth Corbin, *Wells Fargo Faces Criminal Probe Over Sham Diversity Interviews: Report*, Barron's (June 10, 2022).  In November 2022, the situation turned worse for Wells Fargo when the SEC joined the DOJ's probe into the "fake diversity interview" scam.  In a quarterly filing "Wells Fargo disclosed the SEC has undertaken "formal or informal inquiries or investigations regarding the Company's hiring practices related to diversity."

### DEFENDANTS' BREACHES OF FIDUCIARY DUTY AND VIOLATIONS OF LAW

97.     The directors of a Delaware corporation have fiduciary duties of care and loyalty to the corporation and its shareholders.  Under their fiduciary duty of loyalty, directors owe a duty of supervisory oversight.  The duty of oversight mandates that directors conduct the business of the corporation in the best interest of the corporation and its shareholders.  This means always conducting the corporation's business and affairs in accordance with the laws, rules, and regulations applicable to its operations.

98.     This is known as legal compliance.  To effectuate legal compliance, Delaware directors shall adopt and maintain internal controls and risk-management systems to timely bring information about potential financial and non-financial risks to the attention of the board of directors, especially risks of a mission-critical and/or essential nature, *i.e.*, matters on an existential and/or fundamental level that could materially impact a corporation's ability to avoid cessation of its operations.  A failure to establish such a system of controls can make directors liable to the corporation for breach of fiduciary duty.  Also, when knowledge of unethical or unlawful conduct within the corporation comes to the attention of the board of directors, the directors shall stop such

1  wrongdoing.  A failure to act on red flags signaling corporate misconduct or illegality can make

2  directors liable to the corporation for damages.  Officers have the same oversight duties as above

3  related to their area(s) of responsibility, *e.g.*, finance, human resources, manufacturing, etc.

4        99.     At times relevant, defendants failed Wells Fargo on all counts.  They failed to act

5  when faced with a known legal duty, arising in some instances from Consent Orders Wells Fargo

6  entered into with regulators, and, as a result, Wells Fargo did not have enterprise risk-management

7  controls and programs to ensure that it operated only lawfully.  When defendants learned of

8  corporate misconduct and illegality at Wells Fargo, they did not stop it.  Rather, on defendants'

9  watch, Wells Fargo was a serial violator of federal and state consumer protection, banking, and

10  anti-discrimination laws.

11        100.    As particularized above, and a Congressional inquiry found: (i) "Wells Fargo's

12  board of directors failed to ensure management could competently address the Company's risk

13  management deficiencies"; (ii) "Wells Fargo's board of directors allowed management to

14  repeatedly submit materially deficient plans to regulators in response to the consent orders";

15  (iii) "both Wells Fargo's board and management prioritized financial and other considerations

16  above fixing the issues identified by regulators"; (iv) Wells Fargo's board did not hold senior

17  management accountable for repeatedly failing to meet regulators' expectations"; (v) "former

18  Wells Fargo CEO Timothy J. Sloan gave inaccurate and misleading testimony to Congress during

19  a March 2019 Committee hearing"; and (vi) "the potential for widespread consumer abuse still

20  remains at Wells Fargo*."*  Majority Report at 4-5.

21        101.    Additionally, defendants who served on the Wells Fargo Board at the time failed to

22  fix Wells Fargo's legal compliance deficiencies, by making harmed customers whole and ensuring

23  that Wells Fargo had in place risk-management and remediation programs commensurate with its

24  structure, risk profile, complexity, and size.  Majority Report at 74.  They also "resisted the

25  regulators' admonishment to hold executives accountable for the Bank's poor performance in

26  terms of resolving outstanding regulatory issues." *Id.*  Instead, to Wells Fargo's detriment, Wells

27  Fargo's directors "focused on profits and exiting the regulators' consent orders rather than on

28  fixing the Bank's long-standing compliance management weaknesses." *Id.*  "Rather than

1    developing adequate plans in response to the 2018 Federal Reserve Consent Order, Wells Fargo's

2    board and senior management concentrated their efforts on lifting the asset cap." *Id.*  In sum, there

3    was a "prolonged failure of Wells Fargo's board and management to satisfy the terms of the

4    consent orders and establish the safeguards necessary to protect consumers from harm." *Id.* at 8-

5    9.

6            102.    Moreover, the Wells Fargo Board has breached its fiduciary duties of oversight

7    over Wells Fargo's mortgage banking practices.  Despite knowledge of federal and state law

8    prohibiting discrimination in banking and housing based on race, the Wells Fargo Board did not

9    adopt controls, policies, and procedures to prevent Wells Fargo from discriminating against

10   African American mortgage applicants.  Also, when confronted with such unlawful lending

11   practices, the Wells Fargo Board did not immediately cease such unlawful lending practices.  As

12   a result, Wells Fargo is subject to multiple racial discrimination lending lawsuits.  Defendants'

13   disdain for legal compliance in this area has harmed Wells Fargo.

14           103.    Further still, although defendants have a fiduciary duty requiring honest

15   disclosures, they made, and caused Wells Fargo to make, materially false and misleading

16   statements about, among other things, the status of Wells Fargo's legal and regulatory compliance,

17   risk mitigation and remediation activities, and commitment to non-discriminatory bank lending

18   practices.

19           104.    Delaware law does not tolerate law-breakers.  At all times, a Delaware corporation

20   shall adhere and operate within the laws, rules, and regulations applicable to its business.  Plainly,

21   Wells Fargo, under defendants' leadership, has not.  Wells Fargo is a law-breaker.  And so too are

22   defendants for not stopping Wells Fargo's serial violations of law.  Defendants are therefore liable

23   for damages for breaching their fiduciary duties.  The Wells Fargo Board has not and will not hold

24   itself accountable for the fiduciary failures particularized herein.  Plaintiffs therefore seek to

25   vindicate Wells Fargo's rights against its wayward fiduciaries.

26           **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

27           105.    In committing the wrongful acts complained of herein, defendants pursued or

28   joined in the pursuit of a common course of conduct and acted in concert with one another in

1   furtherance of a common plan or design.  In addition to the wrongful conduct complained of herein

2   giving rise to primary liability, defendants further aided and abetted and/or assisted each other in

3   breach of their fiduciary duties and violations of law.

4       106.    Each of the defendants aided and abetted and rendered substantial assistance in the

5   wrongs complained of herein.  In taking such action to substantially assist the commission of the

6   wrongdoing complained of herein, each defendant acted with knowledge of the primary

7   wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his

8   or her overall contribution to and furtherance of the wrongdoing.

9       **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

10       107.    Plaintiffs incorporate ¶¶1-106.

11       108.    The 13 members of the Wells Fargo Board are Steven D. Black, Mark A. Chancy,

12   Celeste A. Clark, Theodore F. Craver, Jr., Maria R. Morris, Richard B. Payne, Jr., Ronald L.

13   Sargent, Charles W. Scharf, Suzanne M. Vautrinot, Richard K. Davis, Wayne M. Hewett, CeCelia

14   G. Morken, and Felicia F. Norwood.

15       109.    Plaintiffs also did not make a demand on the Wells Fargo Board before

16   commencing this lawsuit because making such a demand would be a useless and futile act, and

17   therefore, is excused as a matter of law.  As particularized herein, most of the Wells Fargo Board

18   is substantially liable for damages, injuries, and losses sustained by Wells Fargo because of

19   defendants breaching their fiduciary duties of legal compliance and oversight of Wells Fargo's

20   business and affairs.

21       110.    A sister court recently concluded that a pre-suit demand on the Wells Fargo Board

22   is excused as a matter of law based on substantially the same misconduct of the Wells Fargo Board

23   challenged herein.  *See, e.g.*, *Himstreet v. Scharf*, No. CGC-22-599223 (Cal. Super. Ct., San

24   Francisco Cnty. Oct. 5, 2022).  The California Superior Court's ruling is persuasive authority on

25   the issue of demand futility in this action, if not binding on defendants such they cannot argue a

26   pre-suit demand is not excused as futile in this action.

27       111.    As particularized herein, the Wells Fargo Board knowingly and consciously

28   presided over Wells Fargo's violations of the Consent Orders and other applicable laws and failed

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT -         - 31

1   to make a good faith effort to ensure compliance as required by the Consent Orders, federal law,

2   and Delaware law.  To the opposite, defendants acted in bad faith by not stopping Wells Fargo's

3   serial violations of law, despite their knowledge of same.  A majority of the Wells Fargo Board

4   served as Wells Fargo directors during some or all of the wrongdoing alleged herein, and each of

5   the defendants knew of the wrongdoing and the required remediation but failed to act in the face

6   of a known duty to act.

7           112.    The sustained and systematic failure of the Wells Fargo Board to ensure compliance

8   with the law was a result of the directors' knowing breaches of or reckless disregard for their

9   fiduciary duties.  Although knowledgeable and well-versed in Wells Fargo's serial abuse of its

10  customers and corporate scandal, delivered, in part, by the Consent Orders, the Wells Fargo Board

11  did the unimaginable – nothing.  They did not adopt internal controls and risk-remediation and

12  risk-management infrastructure to ensure Wells Fargo's legal compliance.  Nor did the Wells

13  Fargo Board act and stop unethical and unlawful misconduct at Wells Fargo when confronted with

14  evidence of its existence.  A rinse-and-repeat cycle of violating the law continued unabated at

15  Wells Fargo.  The Wells Fargo Board's misconduct wasted valuable corporate assets.

16          113.    Moreover, as particularized above, despite knowing of their legal duties under the

17  Consent Orders and other laws applicable to Wells Fargo, the Wells Fargo Board failed to adopt

18  controls and risk-management and remediation programs commensurate with Wells Fargo's

19  complexity, size, and risks to ensure compliance with the Consent Orders and the applicable laws.

20  And, when the Wells Fargo Board learned of unethical and unlawful activity within Wells Fargo,

21  including through the Consent Orders, they did not act on these red flags and stop the misconduct.

22  The Wells Fargo Board utterly failed in their oversight duties and thereby are substantially liable

23  for damages, injuries, and losses to Wells Fargo.

24          114.    Likewise, a majority of the Wells Fargo Board face a substantial likelihood of

25  liability for breaching their fiduciary duty of honest disclosure.  At all relevant times, while

26  defendants publicly affirmed Wells Fargo's commitment to diversity, equity, and inclusion and

27  non-discrimination in banking, employment, and housing, the Wells Fargo Board failed to adopt

28  controls   to   prevent   Wells   Fargo   from   discriminating   against   African   American   and

underrepresented persons in Wells Fargo's mortgage loan business.   When confronted with evidence of racially discriminatory lending at Wells Fargo, the Wells Fargo Board failed to act and immediately stop those unlawful practices.   Accordingly, plaintiffs making a pre-suit demand on the Wells Fargo Board is a useless and futile act and therefore excused as a matter of law.

115.   Making a pre-suit demand on Wells Fargo's Board to commence, let alone vigorously prosecute, this action is a useless and futile act for additional reasons.   First, a majority of the members of Wells Fargo's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein.   These are people they have developed professional relationships with, who are their friends, and with whom they have entangling alliances, interests, and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

116.   Second, a majority of Wells Fargo's directors participated in, approved, and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Wells Fargo's shareholders or recklessly disregarded the wrongs complained of herein, and are therefore not disinterested parties.   As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees, and directors and attendance at management and/or board meetings, each of the defendants knew the adverse non-public information regarding Wells Fargo's business and financial condition.   Pursuant to their specific duties as Board members, the members of the Wells Fargo Board are responsible for management of the Company and to lawfully conduct its business affairs.   Defendants breached the fiduciary duty of loyalty owed to Wells Fargo in that they caused false and misleading statements about Wells Fargo's remediation of its faulty risk-management and remediation infrastructure and programs, Wells Fargo's commitment to diversity, equity, and inclusion and non-discrimination in banking, employment, and housing, and Wells Fargo's actual business conditions, operations, and future prospects, including lifting the onerous Federal Reserve asset cap, which remains active today.   Thus, the majority of the Wells Fargo Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to

vigorously prosecute this action because a majority of its members participated personally in the wrongdoing or are dependent upon other defendants who did.

117.    Third, the acts complained of constitute violations of the fiduciary duty of loyalty and care owed by Wells Fargo's directors and these acts are incapable of ratification.

118.    Fourth, the members of Wells Fargo's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

119.    Fifth, any suit by the directors of Wells Fargo to remedy these wrongs would likely further expose the liability of defendants under applicable federal and state laws, which could result in additional civil actions being filed against one or more of the defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

120.    Plaintiffs have not made any demand on shareholders of Wells Fargo to institute this action since such demand would be a futile and useless act for the following reasons:  (i) Wells Fargo is a publicly traded company with more than 3.7 billion shares outstanding, and thousands of shareholders; (ii) making demand on that many shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses, or phone numbers of shareholders; and (iii) making demand on all shareholders would force plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

**COUNT I**

**(Breach of Fiduciary Duty Against All Defendants)**

121.    Plaintiffs incorporate ¶¶1-120.

122.    Defendants owed Wells Fargo fiduciary obligations.  By reason of their fiduciary relationships, defendants owed and owe Wells Fargo the highest obligation of care and loyalty in the management of Wells Fargo.

123.    Defendants each violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.  They have each also been responsible

for the gross and reckless management of Wells Fargo and ignored their fiduciary responsibilities by causing Wells Fargo to engage in the unlawful conduct described herein.

124.    Defendants engaged in the above conduct in intentional breach of their fiduciary duties to Wells Fargo.

125.    Defendants conspired to abuse, and did abuse, their positions of control and oversight at Wells Fargo.

126.    As a direct and proximate result of defendants' failures to perform their fiduciary obligations, Wells Fargo has sustained significant damages.  Plaintiffs seek damages and other relief for Wells Fargo.

**COUNT II**

**(Abuse of Control Against All Defendants)**

127.    Plaintiffs incorporate ¶¶1-120.

128.    Defendants' misconduct alleged herein constitutes an abuse of their ability to control and influence Wells Fargo, for which they are legally responsible.

129.    As a direct and proximate result of defendants' abuse of control, Wells Fargo has sustained significant damages.

130.    As a result of the misconduct alleged herein, defendants are liable to the Company.

**COUNT III**

**(Gross Mismanagement Against All Defendants)**

131.    Plaintiffs incorporate ¶¶1-120.

132.    By their actions alleged herein, defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties regarding prudently managing the assets and business of Wells Fargo in a manner consistent with the operations of a publicly held corporation.

133.    As a direct and proximate result of defendants' gross mismanagement and breaches of duty alleged herein, Wells Fargo has sustained significant damages.

134.    As a result of the misconduct and breaches of duty alleged herein, defendants are liable to the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT -                                      - 35

**COUNT IV**

**(Corporate Waste Against All Defendants)**

135.    Plaintiffs incorporate ¶¶1-120.

136.    As a result of the improper conduct described herein, and by failing to properly consider the interests of Wells Fargo and by refusing to conduct proper supervision, defendants have caused Wells Fargo to waste valuable corporate assets and incur costs to defend defendants' unlawful actions.

137.    As a result of the waste of corporate assets, defendants are liable to the Company.

**COUNT V**

**(Unjust Enrichment Against All Defendants)**

138.    Plaintiffs incorporate ¶¶1-120.

139.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of, and to the detriment of, Wells Fargo.

140.    Plaintiffs, on behalf of Wells Fargo, seek restitution from defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for judgment as follows:

A.    Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered because of the acts and transactions complained of herein, together with pre-judgment interest, to ensure defendants do not participate therein or benefit thereby;

B.    Directing all defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained because of their unlawful conduct, including all salaries, stock awards, and other incentive-based compensation imposing a constructive trust thereon;

C.    Declaring all defendants breached and/or aided and abetted the breach of their fiduciary duties to Wells Fargo;

D.     Directing Wells Fargo to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Wells Fargo and its shareholders from a repeat of the damaging events described herein;

E.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, and imposing a constructive trust on or otherwise restricting defendants' assets to assure that Wells Fargo has an effective remedy;

F.     Awarding Wells Fargo restitution from defendants, and each of them, including ordering disgorgement of all profits, benefits, and other compensation obtained by defendants;

G.     Awarding plaintiffs costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.     Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs request a trial by jury.

DATED:  July 18, 2023                                  ROBBINS GELLER RUDMAN
                                                                        & DOWD LLP
                                                                   SHAWN A. WILLIAMS


                                                                   s/ Shawn A. Williams
                                                            _____
                                                                   SHAWN A. WILLIAMS

                                                            Post Montgomery Center
                                                            One Montgomery Street, Suite 1800
                                                            San Francisco, CA  94104
                                                            Telephone:  415/288-4545
                                                            415/288-4534 (fax)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
   & DOWD LLP
RANDALL J. BARON
TRAVIS E. DOWNS III
BENNY C. GOODMAN III
ERIK W. LUEDEKE
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs

ALLOTTA | FARLEY CO., L.P.A.
MICHAEL E. HEFFERNAN
3240 Levis Commons Blvd.
Perrysburg, OH  43551
Telephone:  419/535-0075
419-535-1935 (fax)

Additional Counsel for Plaintiffs

**VERIFICATION**

I, Timothy Miller, on behalf of SHEET METAL WORKERS LOCAL NO. 33 (CLEVELAND DISTRICT) PENSION FUND ("Sheet Metal Workers"), hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Abuse of Control, Gross Mismanagement, Corporate Waste, and Unjust Enrichment ("Complaint"), and that the Trustees of Sheet Metal Workers authorized the filing of the Complaint and that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 17 day of July, 2023.

SHEET METAL WORKERS LOCAL NO. 33
(CLEVELAND DISTRICT) PENSION FUND

By: _____
Timothy Miller
Chair of the Board of Trustees